UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL D. LEWANDOWSKI,

     Plaintiff,                     Civil Action No. 08-12982

v.                                  HON. AVERN COHN
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Paul D. Lewandowski brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment  DENIED.

## PROCEDURAL HISTORY

On August 19, 2003, Plaintiff filed a claim for DIB, alleging disability as of February 12, 2003 (Tr. 96).  After the initial denial of his claim on November 14, 2003, Plaintiff requested an administrative hearing, held on September 13, 2005 in Oak Park, Michigan (Tr. 496). Administrative Law Judge ("ALJ") Daniel Dadabo, located in Evanston, Illinois, presided by video-teleconference (Tr. 496).  Plaintiff, represented by attorney William Hurley, testified, as did Vocational Expert ("VE") James Radke (Tr. 501-520, 520-528).

ALJ Dadabo held a supplemental hearing on January 18, 2006 at which Plaintiff and medical experts ("MEs") Drs. Cugell and Rozenfeld testified (Tr. 534-550, 551-558, 559-574). On April 10, 2006, ALJ Dadabo determined that Plaintiff was not disabled (Tr. 29). On May 13, 2008, the Appeals Council denied review (Tr. 7-9). Plaintiff filed for judicial review of the final decision on July 11, 2008.

## BACKGROUND FACTS

Plaintiff, born June 24, 1965, was 40 when ALJ Dadabo issued his decision (Tr. 96). He completed high school and diesel mechanic training, working previously as a fleet mechanic supervisor (Tr. 116, 119). He alleges disability as a result of memory loss and leg weakness following a workplace chemical explosion (Tr. 93).

### A.    Plaintiff's Testimony

### 1.  September 13, 2005

 Plaintiff testified that he experienced leg weakness, hand pain, muscle spasms, and radiating pain in all extremities (Tr. 501). He reported that a typical day consisted of preparing a beverage, watching television, sitting outside if the weather permitted, preparing a meal, "get cleaning up," performing yard work, watching movies, and working on his internet home page (Tr. 503). Taking into account bathroom breaks, Plaintiff estimated that he could sit for up to eight hours without difficulty (Tr. 504).

Plaintiff alleged that as a result of inhaling fumes at the time of the workplace explosion, he experienced hand weakness which periodically caused him to lose grip strength, but testified that he continued to handle, hold, grasp, manipulate, and twist with his upper extremities on an *occasional* basis (Tr. 504-505). He stated that muscle fatigue prevented him from walking long distances, but estimated that he could walk "a block or two," stand up to 90 minutes, and lift 10 pounds without difficulty (Tr. 505-506).

-2-

Plaintiff testified that he had not traveled out of state since the February, 2003 accident (Tr. 507). He reported that he currently took Aricept for memory problems and a thyroid medication, adding that he had been prescribed by Neurontin and Namenda in the past (Tr. 508). Plaintiff noted that in addition to memory problems, he experienced periodic headaches and balance problems (Tr. 508). He also reported shooting pains in all extremities and "pins and needles" pain on a daily basis (Tr. 509). Despite memory problems, Plaintiff testified he continued to drive, adding that he occasionally "[took] the wrong roads," but was eventually able to find his way to his destination (Tr. 510).

Plaintiff reported that he had recently received a lump sum settlement from Workers' Compensation and had not applied for other work since his accident (Tr. 510-511). He denied problems writing on a limited basis (Tr. 511-512). Plaintiff admitted that he continued to smoke intermittently and denied undergoing physical rehabilitation since the accident (Tr. 512). He indicated that although he continued to perform household and yard chores, he worked slowly and required break periods (Tr. 512-513).

In response to questions by his attorney, Plaintiff stated that although Neurontin had initially improved his memory, the drug became less effective after two years of use (Tr. 515). He opined that he was unable to perform the lifting and gripping requirements of his past relevant work, noting that his most recent job required him to lift up to 150 pounds (Tr. 517-518).

### 2.  January 18, 2006

Plaintiff alleged that the commercial aerosol "Brake Clean" that he had used on a daily basis at work was responsible for his concentrational problems predating the February, 2003 accident (Tr. 551). Plaintiff estimated that he had used up to 10 cans of Brake Clean every workday for four and a half years (Tr. 552).

-3-

### B.  Medical Expert #1 - January 18, 2006 Hearing

Dr. Cugell, noting his former position as director of a pulmonary function laboratory, found that the July, 2003 pulmonary test results performed by Dr. Harbut showed "essentially normal values" (Tr. 534-535).   He opined that "minor deviations from normal" were likely attributable to the fact that Plaintiff smoked, finding the absence of "any significant limitation on physical endurance or activity due to the basis of lung disease" (Tr. 535).   He noted further that a spirometry showing deviation was attributable to Plaintiff's failure to "fully inflate[]" his lungs when undergoing the test (Tr. 536).  Addressing Plaintiff's claims of neurological deficits as a result of hydrocarbon exposure, Dr. Cugell opined that "the consequences" of significant hydrocarbon exposure would "slowly resolve," adding that he found no evidence of a "significant impact" (Tr. 536).   Dr. Cugell concluded that he could not "find any measurements that would support [Plaintiff's] claim . . of being limited" (Tr. 538).  He discounted the possibility that Plaintiff experienced heart problems, noting that a March, 2003 echocardiogram was normal (Tr. 539).   He opined that Dr. Harbut "misconstrued the significance of an isolated abnormality in the reduction of a diffusing capacity," noting that the treating physician's "recommendations [were] not justifiable on the basis of an isolated reduction on diffusing capacity" (Tr. 556).

### 2.  Medical Expert #2 - January 18, 2006 Hearing

Dr. Rozenfeld found that an IQ test's low to average results were unrelated to "the work related incident" (Tr. 559).  He noted that two neuropsychologists "came up with  a markedly different opinion," citing a July, 2003 GAF assignment of 60 and February, 2004 GAF assignment of 56 (by Dr. Drasnin); and an August, 2003 GAF of 81-90 (by Dr. Greiffenstein) (Tr. 560-561).  Dr. Rozenfeld found that the GAFs by Dr. Drasnin "impl[ied] a level of impairment which [was] not supported by the test results" (Tr. 563).  Finding the

-4-

absence of marked concentrational deficiencies, Dr. Rozenfeld found, even assuming the veracity of Dr. Drasnin's more extreme findings, that Plaintiff could perform "simple, routine tasks and . . . in some detail, a complex task (Tr. 565).

In response to questioning by Plaintiff's attorney, Dr. Rozenfeld stated that Plaintiff's IQ tests showed an average ability to learn new verbal, visual, or spacial information as well as an average long-term visual and spacial memory (Tr. 570). Dr. Rozenfeld noted that she could not address the observations of Dr. Morson, Plaintiff's treating physician (Tr. 570). Dr. Rozenfeld observed that both Drs. Drasnin and Greiffenstein's findings suggested that Plaintiff's post accident test scores were "probably more representative of pre-morbid function" (Tr. 573). She concluded her testimony by stating that Dr. Morrison's conclusion that Plaintiff was "basically functioning like an Alzheimer's patient" was inconsistent with the findings of both Drs. Drasnin and Greifenstein (Tr. 573).

### C.    Medical Evidence

### 1. Treating Sources

On February 14, 2003, Tracey Morson, M.D. examined Plaintiff, noting that the February 6, 2003 accident had singed his facial hair (Tr. 300). Dr. Morson, observing that Plaintiff reported leg weakness, noted that the exam was unremarkable with the exception of "a decrease in pinprick in a stocking distribution" (Tr. 301). On February 28, 2003, Brian N. Kirschner, M.D. performed a consultive neurological exam, noting that Plaintiff "fell backwards and suffered mild burns"at the time of the accident, but remained "fully oriented" (Tr. 216-217). Nerve conduction studies by Dr. Morson showed "bilateral tibial neuropathies" but otherwise normal results (Tr. 297). An MRI of the brain showed no abnormalities (Tr. 299). Dr. Kirschner, noting "a number of complaints consistent with mild closed head injury and antitoxic solvent exposure, including significant headaches, diffuse

paresthesias, and diffuse fasciculation," observed that "all of these symptoms seem[ed] to be improving" (Tr. 217). Dr. Kirschner deemed the neurological examination "unremarkable" (Tr. 217). The same day, neuro-ophthalmologist David W. Blodgett, M.D. found a "pupillary defect on the right side as well as a subtle superior visual field defect," finding that both conditions were attributable to the February 6, 2003 accident (Tr. 271).

The following month, Elias M. Michaelides, M.D. found "mild" hearing loss (Tr. 220). Also in March, 2003, an echocardiogram showed unremarkable results (Tr. 223). Soubeil Saba, M.D., finding an absence of ischemic risk, noted that "the sensitivity of the study" was "markedly reduced in view of the submaximal augmentation of [the] heart rate (Tr. 225). The same month, Dr. Morson noted that Plaintiff demonstrated "5/5 strength throughout" with normal vital signs (Tr. 292). Pulmonary studies ordered by Michael Harbut, M.D. showed minimal "obstructive airways disease and "moderately severe diffusion effect" (Tr. 335).

An April, 2003 Cardiopulmonary Exercise Report showed no abnormalities (Tr. 283). Dr. Harbut's examination notes indicate that Plaintiff's lungs were clear (Tr. 316, 318). The same month, a CT scan of the thorax was unremarkable (Tr. 331). In May, 2003, Dr. Morson noted that Plaintiff demonstrated stable vital signs, with a normal gait and reflexes, but observed that Plaintiff was "very anxious" (Tr. 281). A July, 2003 examination by Kevin D. Nolan, M.D. showed no evidence of "arterial insufficiency" (Tr. 231).

July and September, 2003 pulmonary studies again showed minimal "obstructive airways disease" and "moderately severe diffusion effect" (Tr. 326, 330). Dr. Harbut found that Plaintiff experienced asthma, chest pain, shortness of breath, cough, muscle and joint aches, generalized weakness, uncontrolled shaking, nausea, memory loss, chills, and night sweats (Tr. 311). In July, 2003, Dr. Harbut was deposed, testifying that a March, 2003

pulmonary function yielded "a suppressed diffusing capacity . . . . consistent with an asthmatic response" (Tr. 154). He opined that Plaintiff could not return to his former job, noting that long-term exposure to toxic chemicals was more damaging to Plaintiff's health than injuries sustained in the February 6, 2003 accident (Tr. 172).

In September, 2003 David R. Drasnin, PhD. conducted a neuropsychological evaluation of Plaintiff, finding "average visual attentional speed," "below average accuracy," and verbal memory and visual memory scores "in the mildly decreased range" (Tr. 235). Dr. Drasnin, finding "dementia, related to neurotoxicity," nonetheless assigned Plaintiff a GAF of 60[1] (Tr. 238). The following month, a "Scales of Cognitive Ability for Traumatic Brain Injury"("SCATBI") was administered to Plaintiff showing borderline "recall and reasoning"skills (Tr. 251-252). Kristy Piana Schena, M.S., finding that Plaintiff scored in the 90th percentile, noted that "[a]n adult independent with activities of daily living should receive percentage scores of 90% or better (Tr. 251). The same month, Dr. Morson found stable vital signs and Plaintiff "alert and oriented times three" with fluent speech and normal muscle tone (Tr. 273). She observed that Plaintiff's history of acute inflammatory polyneuropathy "was resolving" (Tr. 274).

In February, 2004, Dr. Drasnin re-administered neuropsychological tests, noting that the test results, along with Plaintiff's allegations of forgetfulness, created a "neuropsychological profile that does not show a consistent pattern of neuropsychological recovery," attributing the results to "sustained permanent cognitive impairment, and/or that emotional factors are impacting cognitive performance" (Tr. 389). Dr. Drasnin assigned

---

[1]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-Text Revision (4th ed.2000) at 30 ("DSM-IV Manual").

Plaintiff a GAF of 56 (Tr. 389).

In January, 2005, Dr. Morson, noting that Plaintiff had not been insured for "several months," stated that Plaintiff continued to experience muscle aches, twitching of the upper extremities, and memory problems (Tr. 382). Dr. Morson prescribed Neurontin, also recommending that Plaintiff "read more books and . . . perform more puzzles and work games" (Tr. 382). In April, 2005, A. Robert Spitzer, M.D., remarked that he was "perplexed" that Plaintiff's symptoms of toxic neuropathy or toxic myelopathy had not improved in the two years since the accident (Tr. 379). MRIs of the brain and cervical spine were unremarkable (Tr. 380). A Tibial Somatosensory Evoked Potential Recording ("SEP") showed normal results (Tr. 411). In July, 2005, a CT scan of the chest was also unremarkable (Tr. 405). The same month, Dr. Harbut found that Plaintiff's Maximum Inspiratory Pressure Evaluation showed a "[h]istory of neuromuscular disease" (Tr. 404).

On September 28, 2005, Dr. Morson was deposed, stating that Plaintiff experienced "acute inflammatory polyneuropathy" ("AIPN") (Tr. 363). Dr. Morson noted that nerve conduction studies showed the presence of tibial and peroneal nerve problems (Tr. 364). She admitted that she had never observed tremors (Tr. 365). Dr. Morson also stated that Plaintiff also "had optic neuritis" which created headaches and memory problems (Tr. 365). She opined that Plaintiff was unable to either return to his former job as a diesel truck mechanic or any other work "based upon his lack of organizational skills, anxiety factors, [and] problems with memory" (Tr. 368-372). Dr. Morson concluded her testimony by opining that Plaintiff was permanently incapable of all full-time work (Tr. 374).

## 2. Non-Treating Sources

April, 2003 consultive examination notes by Thomas J. Petz, M.D. indicate that Plaintiff continued to complain of shortness of breath upon walking more than 40 feet,

muscle spasms, pinprick pain, and muscle weakness (Tr. 242-243).  Plaintiff reported only a "rare" headache (Tr. 244).  He admitted to smoking five cigarettes a day and occasional alcohol use (Tr. 245).  Plaintiff's lungs were clear to percussion and he showed a good range of motion ("ROM") in all joints (Tr. 247).  Oxygen saturation was 98 percent (Tr. 247).  Dr. Petz noted that the "minor" facial burns sustained in the February, 2003 accident were healing "satisfactorily" (Tr. 248).  Dr. Petz found, based on his examination and review of Plaintiff's medical records, the absence of "objective findings for organic disease" (Tr. 249).  In August, 2003 Dr. Petz stated that after reviewing Plaintiff's newer treating records, his April, 2003 assessment of Plaintiff's condition remained unchanged (Tr. 240).

In September, 2003, M. Frank Greiffenstein, Ph.D. conducted an independent neuropsychological consultive examination of Plaintiff (Tr. 254-263).  Plaintiff appeared athletic and neatly dressed, exhibiting appropriate psychomotor behavior with sustained concentration and fluent speech (Tr. 254-255).  Plaintiff acknowledged that prior to the accident, he smoked two packs of cigarettes each day (Tr. 257).  Dr. Greiffenstein noted that Plaintiff made a one-day work attempt two days after the accident but was told by a supervisor that he was "slow" (Tr. 255).  He observed that a February 20, 2003 EMG showed "bilateral tibial neuropathies," but that an MRI of the brain, pulmonary testing, and blood gas results were normal (Tr. 258).  Dr. Greiffenstein remarked that Plaintiff had consulted an attorney  within a week of the accident (Tr. 258).  Neuropsychological testing showed "no evidence for the types of mistakes made by brain-damaged individuals" (Tr. 261).  Plaintiff's profile was consistent with individuals presenting "themselves as physically disabled while simultaneously denying any emotional problems" (Tr. 261).  Dr. Greiffenstein, noting that

Plaintiff was "an excellent historian," assigned him a GAF of 81-90[2] (Tr. 261-262).

An October, 2003 Psychiatric Review Technique by Zahra Yousuf, M.D. found the absence of severe mental impairments (Tr. 201). Noting that a psychological evaluation from the previous month showed that Plaintiff was "alert" and "oriented," Dr. Yousuf found that Plaintiff's psychological limitations were confined to "mild" difficulties maintaining "concentration, persistence, or pace" (Tr. 211, 213).

### 3.  Material Submitted Subsequent to the ALJ's Determination

Dr. Harbut was deposed by Plaintiff's attorney on February 7, 2008. He testified that he continued to treat Plaintiff for interstitial lung disease, pulmonary fibrosis, obstructive lung disease, encephalopathy, and neuropsychological dysfunction (Tr. 442). Dr. Harbut opined that Plaintiff's activities were "significant[ly] limited" as a result of pulmonary conditions, noting that Plaintiff's exposure to trichloroethylene had affected his neuropsychological apparatus" (Tr. 443-444). Dr. Harbut found that Plaintiff's anxiety and sensitivity to respiratory irritants  precluded all work (Tr. 473, 475).

On October 6, 2008, Dr. Drasnin conducted a neuropsychological evaluation. *Plaintiff's Brief,* Exhibit. In an October 13, 2008 letter addressed to Dr. Harbut, Dr. Drasnin indicated that his "preliminary findings" showed "mild" deficiencies in problem solving ability but "[m]arkedly atypical results" in visual attention, and "visual spatial memory ranges from mild to severely impaired on [two tests." *Id.*

### C.    Vocational Expert Testimony, September 13, 2005

---

[2]

GAF scores in the range of 81-90 indicate "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-Text Revision (4th ed.2000*)* at 34 ("DSM-IV Manual").

VE James Radke classified Plaintiff's diesel mechanic work (as performed) as skilled at the very heavy exertional level; auto mechanic, skilled, medium; cook, unskilled, medium (as performed); and truck driver, medium, unskilled[3] (Tr. 521, 523).   The ALJ then posed the following set of limitations to the VE, taking into account Plaintiff's age, education, and work background:

> "[An individual] limited to a sedentary level of exertion [with] pulmonary function tests . . . documenting a 65 percent reduction in capacity for predicted work related activity.   The individual also has different levels of cognitive dysfunction . . . indicat[ing] a GAF between 56 to 60 . . . moderate restrictions due to whatever the long term effects of the inhalation caused . . . [precluding] complex, detailed tasks . . . limited to doing only unskilled simple work, learnable on short demonstration"

(Tr. 524).

The VE replied that the above limitations would rule out all of Plaintiff's former work, finding however that the individual could perform the unskilled, sedentary work of an office clerk (1,000 positions in the regional economy), receptionist (650), and assembler or fabricator (2,100) (Tr. 524-525).   The VE testified further that if the same individual experienced the environmental limitations of avoidance of "excessive pulmonary irritants, fumes, dust, toxic chemical, or temperature extremes," the assembler/fabricator positions would be reduced to 1,000 (Tr. 525-526).   The VE then found that if the individual were limited to occasional handling, holding, grasping, and manipulating, the office clerk and

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;   *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.   *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

assembler/fabricator positions would be limited and the receptionist position numbers would be reduced to "less than 200" (Tr. 526). The VE concluded that if the same individual "be[came] easily fatigued" and required "unscheduled unpredictable breaks to rest" all competitive employment would be precluded (Tr. 527).

### D.    The ALJ's Decision

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of "demyelinating neuropathy, moderately-severe diffusion defect, temporary dementia secondary to neurotoxicity, a pre-morbid learning disorder and benign myalgia," determining however that none of the impairments met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 23-24, 28). The ALJ found that while Plaintiff was unable to perform any of his past relevant work, he retained the residual functional capacity ("RFC"):

> "for sedentary work, subject [to] sedentary exertion, subject to the need for unskilled work, involving tasks that can be learned on short demonstration, and the need to avoid excessive dust, fumes, odors, gases and pulmonary irritants"

(Tr. 25, 28). Adopting the VE's job findings, *supra*, the ALJ found that Plaintiff could perform a significant range of sedentary work including jobs as an assembler (1,000 jobs), office clerk (1,000), and receptionist (650) (Tr. 28).

Citing pulmonary and IQ testing results, the ALJ rejected Plaintiff's allegations of disability (Tr. 24-25). He noted that Plaintiff continued to drive, mow his lawn, read the news online, shop, write checks, and perform household chores (Tr. 26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of*

-12-

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff argues first that the ALJ's performed a procedurally and substantively inadequate analysis of his treating physicians' disability opinions. *Plaintiff's Brief,* 5-16, *Docket #11.* On a related note, he argues that Dr. Harbut's February 7, 2008 deposition testimony constitutes "new and material"evidence. *Id.* at 5-6 (*citing* Tr. 436-478). Plaintiff also argues that the administrative decision's job findings do not reflect the VE's responses to the hypothetical question. *Id.* at 17-19. Because the treating physician argument requires a multi-part analysis, the Court will discuss the job findings argument first.

### A. The ALJ's Job Findings

Plaintiff argues that "it is clear [ALJ] Dadabo failed to accurately calculate the number of jobs available to [Plaintiff] based on the hypothetical questions that were posed." *Plaintiff's Brief* at 17. Noting that the RFC in the administrative opinion includes "the need to avoid excessive dust, fumes, odors, gases and pulmonary irritants," Plaintiff contends that the job numbers cited by the VE and adopted in the opinion do not reflect these limitations. *Id.* (*Citing* Tr. 28, 526-527).

As noted *supra,* at the first administrative hearing, the ALJ began the hypothetical question with the following hypothetical limitations:

> "[An individual] limited to a sedentary level of exertion [with] pulmonary function tests . . . documenting a 65 percent reduction in capacity for predicted work related activity. The individual also has different levels of cognitive dysfunction . . . indicat[ing] a GAF between 56 to 60 . . . moderate restrictions due to whatever the long term effects of the inhalation caused . . . [precluding] complex, detailed tasks . . . limited to doing only unskilled simple work,

-14-

learnable on short demonstration"

(Tr. 524).

The VE found that the above limitations would rule out all of Plaintiff's former work, but would allow him to perform the unskilled, sedentary work of an office clerk (1,000 positions in the regional economy), receptionist (650), assembler or fabricator (2,100) (Tr. 524-525).

Next, the ALJ imposed the additional limitations of avoidance of "excessive pulmonary irritants, fumes, dust, toxic chemical, or temperature extremes" (Tr. 525).  In response, the VE testified that the assembler/fabricator positions would be reduced to 1,000, but the other job findings would remain unchanged (Tr. 525-526).

Plaintiff's argument is somewhat confusing.  The administrative decision's RFC and job findings (setting forth the limitations in the original question plus the added environmental limitations) comports exactly with the VE's testimony that given these limitations, the hypothetical individual could perform the work of an office clerk (1,000), receptionist (650), assembler or fabricator (1,000).  Plaintiff's argument to the contrary is without merit.

In an effort to understand Plaintiff's argument, I note that the ALJ next added additional hypothetical limitations, restricting the individual to *occasional* gripping, manipulating, handling, and twisting (Tr. 526).  The VE responded that given these added limitations, the assembler and file clerk jobs would be eliminated and the receptionist jobs reduced to "less than 200" (Tr. 526).  Although not expressed in his brief, Plaintiff apparently contends that the upper extremity limitations were improperly omitted from the RFC.

However, the fact that the ALJ inquired about the vocational impact of these impairments did not mandate their inclusion in the final RFC.  "[T]he ALJ is not obliged to

-15-

incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)).  As noted by the ALJ, although Plaintiff testified that he was limited to the occasional use of his arms and hands, the omission of these limitations from the RFC is supported by substantial evidence that Plaintiff was able to "clean house, do grocery shopping, write checks . . . wash dishes,"continue use his computer, drive, and perform yard work (Tr. 26).

**B.  The Treating Physician Analysis**

### 1.  Basic Principles

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* — F. 3d — , 2009 WL 2146467, *3 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004)).  Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson,* at 544.

Regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, the ALJ is required nonetheless to give "good reasons"

-16-

for rejecting the treating physician's opinion:

> "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).  The mere fact that a treating physician's opinion is contradicted by another source is not a sufficient basis for its rejection.  *Hensley* at *3 ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.").  However, in the presence of contradicting substantial evidence, the ALJ may  reject all or a portion of the treating source's findings.  *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004).

## 2.  Dr. Harbut's February 7, 2008 Post-Administrative Deposition Testimony

Plaintiff's brief cites Dr. Harbut's February, 2008 deposition numerous times for the proposition that the ALJ erred in adopting ME Dr. Cugell's findings that Plaintiff's pulmonary limitations were "minor." *Plaintiff's Brief* at 14-16, (Tr. 26, 535).

Material submitted  subsequent to the administrative decision is subject to a narrow review by the district court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993). Where the Appeals Council denies a claimant's  request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Id.* at 695-96.  Sentence Six of 42 U.S.C.A. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but *only upon a showing that there is new evidence which*

*is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . .*" (emphasis added).   Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g).

Because Plaintiff requests the consideration of material submitted after the ALJ's April 10, 2006 decision, this argument is construed as a request for a "Sentence Six" remand. 42 U.S.C. § 405(g).   Indeed, he employs Sentence Six catchwords, noting that Dr. Harbut's 2008 testimony should be considered because it is "new and material." *Plaintiff's Brief* at 5. The fact that Plaintiff did not request a Sentence Six remand does not prevent the Court from granting such relief *sua sponte*. *Street v. Commissioner of Social Security,* 390 F.Supp.2d 630, 640 (E.D.Mich.2005).   However, despite the fact that both Defendant and this Court construe the citation of Dr. Harbut's later testimony as a request for a Sentence Six remand, Plaintiff's response to the government's motion inexplicably states that he "is not seeking a sentence 6 remand."[4] *Reply,* 4.   Plaintiff has expressively waived this argument.

Even assuming for the sake of argument that *Street, supra,* permits the Court to grant a remand under Sentence Six, Plaintiff's failure to show "good cause" for the submission of Dr. Harbut's later testimony is fatal to his claim.   Plaintiff submits that "[o]nce [ALJ] Dadabo's decision was reduced to writing and the hearing tape was made available, counsel sought to refute the comments of retained reviewer [Dr.] Cugell with new and material evidence from treating physician [Dr.] Harbut." *Plaintiff's Brief* at 13.   Plaintiff's acknowledgment that Dr. Harbut's February, 2008 deposition was created for the purpose

_____

[4]Both parties agree that an October 13, 2008 "preliminary report" by Dr. Drasnin attached to Plaintiff's brief is irrelevant to his condition on or before April 10, 2006 administrative decision.  Plaintiff states that it is included only to establish that he has an "continuing relationship" with Dr. Drasnin. *Reply* at 4.

of "refuting" Dr. Cugell's opinion does not constitute good cause.   "[G]ood cause
contemplates more than strategic delay, or sandbagging, of evidence and more than simple
miscalculation of the necessity of producing such evidence in the first instance to establish
a claim of disability. *Haney v. Astrue,* 2009 WL 700057, *6  (W.D.Ky. 2009)(*citing Thomas
v. Secretary,* 928 F.2d 255, 260 (8th Cir., 1991).   By Plaintiff's own admission, Dr. Harbut's
February, 2008 testimony was taken in an attempt to sandbag Dr. Cugell's findings.   Even
to the extent that Dr. Harbut's testimony could be construed "material" to the administrative
outcome, Plaintiff offers no support for his failure to submit the physician's "explanation"
of the pulmonary tests prior to the administrative decision.   As such, the Court cannot
consider the material submitted after April 10, 2006.

### 3.  Pulmonary Conditions - Dr. Harbut versus Dr. Cugell

Plaintiff faults the ALJ for adopting the findings of Dr. Cugell, a non-examining
source over  Dr. Harbut's opinion.   *Plaintiff's Brief* at 7-9.   He argues that under *Wilson,
supra,* the ALJ erred by rejecting Dr. Harbut's findings.   *Id.*   This argument is based in large
part on Dr. Harbut's February 7, 2008 deposition testimony, which includes the physician's
opinion that Plaintiff is unable to perform any work.   (Tr. 473, 475).   As discussed *supra,*
Plaintiff has  provided neither good cause for the late submission nor its materiality to the
ALJ's decision.   Thus, the Court can consider only Dr. Harbut's findings submitted on or
before April 10, 2006.

In fact, the ALJ adopted most of Dr. Harbut's July, 2003 findings:

Q:             What specific restrictions would you impose?

Dr. Harbut:

                      . . . I think that he should be in a clean air environment and depending
                      on how much of his exercise tolerance he recovers, if he does recover

> it, he should be in a job that doesn't require more than 65 percent of
> the maximal tolerable exercise because that's he could do on the test.
> So it should be a fairly sedentary clean air job that's not going to be
> dangerous to others or to the patient's well-being.

(Tr. 172-173).

Because the ALJ's RFC finding that Plaintiff could perform sedentary work in the absence of irritants, fumes, dust, toxic chemicals, or temperature extremes comports with Dr. Harbut's July, 2003 assessment, the ALJ cannot be faulted for failing to explain a non-existent "rejection" of the treating physician's opinion (Tr. 25). The ALJ noted that Dr. Harbut's unadopted findings of more dramatic limitations were contradicted not only by the findings of ME Dr. Cugell, but Harbut's own observations (Tr. 26). To the extent that the ALJ adopted Dr. Cugell's interpretation of the objective pulmonary tests over Dr. Harbut's conclusion, the ALJ, citing the ME's testimony, permissibly found that Plaintiff's oxygen saturation rate of 97% was inconsistent with Dr. Harbut's finding of "hypoxemia (under-oxygenation)" (Tr. 26)

### 3. Neuropsychological Impairments - Dr. Drasnin versus Dr. Greiffenstein

Plaintiff contends next that the ALJ erred by adopting the findings of Dr. Greiffenstein, a one-time examiner, over the findings of Dr. Drasnin, who administered neuropsychological tests on at least two occasions. *Plaintiff's Brief* at 9-10. Likewise here, the ALJ adopted the majority of Dr. Drasnin's findings, noting that the doctor's GAF finding of 56-60 (although at least 20 points below Dr. Greiffenstein's assessment) comported with the administrative finding that Plaintiff could perform unskilled work (Tr. 25); *See also* fn. 1, *supra.*

### 4. Dr. Morson

Finally, Plaintiff faults the ALJ for rejecting his treating neurologist's finding that he was incapable of gainful employment. *Plaintiff's Brief* at 10-13. In September, 2005, Dr.

-20-

Morson stated unambiguously that she believed Plaintiff was disabled from all work due to his lack of organizational skills, anxiety, and "memory issues" (Tr. 330-332).

The ALJ's discussion of Dr. Morson's treatment records indicates that he adopted her observations that "claimant' s lungs were clear to auscultation and there was no evidence of cyanosis, clubbing or edema" (Tr. 25).   Having adopted a portion of her clinical findings, the ALJ explained his reasons for rejecting her finding that Plaintiff was disabled: "Dr. Morson, the treating neurologist, was not qualified to comment on psychological capacities. . . . These assessments lie outside [her] neurological expertise and accordingly, to that extent, are entitled to very limited weight" (Tr. 26).

The ALJ's rejection Dr. Morson's disability opinion comported with the requirements of a "treating physician" analysis by acknowledging her specialty and treating relationship with Plaintiff (Tr. 25-26).  Further, he gave "good reasons" for rejecting her disability pronouncement, observing that her opinion regarding Plaintiff's "anxiety" and lack of organizational skills were peripheral to her area of specialty (Tr. 26). *Wilson, supra,* at 544.  Although Plaintiff contends that as a neurologist, Dr. Morson was better qualified to assess Plaintiff's mental state than a psychologist, her treating notes show no evidence showing that she made psychological observations or assessments (beyond noting that Plaintiff appeared anxious) or treated him for psychological issues.

Aside from the fact that Dr. Morson's disability opinion flatly contradicts the findings by Dr. Greiffenstein and ME Dr. Rozenfeld, Dr. Morson's *own* treating notes stand at odds with her September, 2005 testimony of extreme and disabling limitations.  Eight days after Plaintiff's February, 2003  accident, her notes state that a neurological examination  showed normal results with the exception of a "decrease in pinprick in a stocking distribution (Tr.

301).  This is consistent with Dr. Kirschner's finding of an "unremarkable" neurological examination from the same month (Tr. 217).  Also in February, 2003, Dr. Morson wrote that nerve conduction studies were normal except for "bilateral tibial neuropathies" (Tr. 297). In May, 2003, she found that while Plaintiff appeared "very anxious," he demonstrated a normal gait, normal vital signs and reflexes, and fluent speech (Tr. 281). She observed 5/5 strength "throughout," noting that the "inflammatory neuropathy" was "resolving" (Tr. 281). She concluded that Plaintiff showed "objective improvement" (Tr. 281).   June and September, 2003 treating notes by Dr. Morson show similarly unremarkable findings (Tr. 273, 278).  While her January, 2005 treating notes state that Plaintiff complained of "memory loss," an examination again showed normal results (Tr. 382).

In closing, I note that while the evidence shows that Plaintiff's Workers' Compensation claim (followed by the DIB claim) has been aggressively pursued since the week following his February, 2003 accident, substantial evidence and the ALJ's well-articulated discussion of the treating physicians' opinions support the non-disability finding. Although Plaintiff objects to even the partial adoption of the non-examining medical experts, ALJ Dadabo obviously "went the extra mile" to ensure a fair decision by holding a second hearing.  His decision is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.

Any objections to this  Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich.

-22-

LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 29, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 29, 2009.

S/Andrea Teets
Deputy Clerk

-23-